SO ORDERED,

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: April 22, 2015

The Order of the Court is set forth below. The docket reflects the date entered.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

GERALD ADAMS AND                                    CASE NO. 12-02569-NPO
KAY ADAMS,

        DEBTORS.                                    CHAPTER 7

FIRST BANK                                          PLAINTIFF

VS.                                         ADV. PROC. NO. 14-00046-NPO

GERALD ADAMS AND                                    DEFENDANTS
KAY ADAMS

### MEMORANDUM OPINION AND ORDER ON COMPLAINT

This matter came before the Court for trial (the "Trial") on March 4, 2015 on the

Complaint (the "Adversary Complaint") (Adv. Dkt. 1)[1] filed by First Bank ("First Bank") against

the debtors, Gerald Adams ("Mr. Adams") and Kay Adams ("Mrs. Adams" or, together with Mr.

Adams, the "Debtors") in the Adversary.  At Trial, First Bank was represented by Eileen N.

---

[1] Citations to docket entries in the above-referenced adversary proceeding (the "Adversary") are cited as (Adv. Dkt. ____)" and citations to docket entries in the above-styled bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. ____)".

Shaffer, and the Debtors were represented by W. Lee Watt ("Watt").[2]  The Pretrial Order (the "Pretrial Order") (Adv. Dkt. 32) was entered on February 19, 2015.  By stipulation, nine (9) joint exhibits were introduced into evidence at Trial; First Bank introduced into evidence two (2) additional exhibits.[3]  Having considered the pleadings, exhibits, and testimony presented at Trial, the Court finds as follows:[4]

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  Notice of the Trial was proper under the circumstances.

## Procedural History

1.      On August 8, 2012, this Bankruptcy Case was filed as a voluntary chapter 11 case (Bankr. Dkt. 1) with the Debtors serving as debtors-in-possession.

2.      For reasons explained later in this Opinion, the Court determined on May 23, 2013 that the Debtors should no longer serve as debtors-in-possession and appointed J. Stephen Smith ("Smith") as the chapter 11 trustee (Bankr. Dkt. 228).

---

[2] Douglas C. Noble ("Noble") and Sean R. Guy ("Guy") of the law firm McCraney Montagnet Quin Noble, PLLC represented the Debtors in the Adversary until January 9, 2015 when Watt of the law firm Gibbs, Whitwell & Travis, PLLC was substituted as counsel.  (Adv. Dkt. 20).  With respect to the Bankruptcy Case, Craig M. Geno represented the Debtors until he withdrew as their counsel effective September 30, 2013 (Bankr. Dkt. 263).  Then, on October 16, 2013, Noble entered an appearance in the Bankruptcy Case as corporate and general counsel for the Debtors (Bankr. Dkt. 292) and remains as such in the Bankruptcy Case as of this Opinion.

[3] The joint exhibits are cited as "(Jt. Ex. _____)", and First Bank's exhibits are cited as "(F.B. Ex. _____)".

[4] Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, the following constitutes the findings of fact and conclusions of law of the Court without regard to which section of the Opinion they are found.

3.      On October 21, 2013, the Court granted Smith's unopposed request to convert the chapter 11 case to a chapter 7 case (Bankr. Dkt. 295).  Smith then became the chapter 7 trustee.

**Facts**

4.      At issue in the Adversary is the Debtors' alleged concealment of furniture, artwork, jewelry, and firearms of significant value that they kept in different homes owned by two non-debtor entities, Adams & Adams Management, LP ("Adams & Adams") and Hickory Hills Hunting Preserve, Inc. ("Hickory Hills") that occurred while the Debtors were serving as debtors in possession.  Also at issue is the Debtors' alleged transfer of estate funds into a checking account held by Adams & Adams that likewise occurred before the appointment of a trustee.

5.      Less than seventeen (17) months before the commencement of this Bankruptcy Case, the Debtors formed Adams & Adams, a Mississippi limited partnership, on March 22, 2011 purportedly to serve as a holding company for certain investment properties and to afford themselves some protection from personal liability in the operation of those properties.  Among the properties transferred by the Debtors to Adams & Adams in March 2011 was Twelve Oaks, a plantation home surrounded by four (4) acres of waterfront property in Gautier, Mississippi and listed on the National Registry of Historic Places.  Other property transferred by the Debtors to Adams & Adams included 137 acres of timberland in Copiah County, Mississippi and another 647 acres also located in Copiah County, Mississippi.  The Debtors opened a bank account on behalf of Adams & Adams in February 2012 (the "Adams & Adams Account") to pay expenses associated with the upkeep of these properties.  Mrs. Adams is a signatory on the Adams & Adams Account, and it is her signature that appears on the checks drawn on the Adams & Adams Account that are at issue in the Adversary.

6.      The Debtors hold a 95% interest in Hickory Hills, which operates a large hunting preserve near Hermanville, Mississippi.  Located on the premises of Hickory Hills is the lodge where the Debtors currently reside (the "Hickory Hills Lodge") with their adult son.[5]

7.      When the Debtors filed their joint petition for relief (the "Petition") (Bankr. Dkt. 1) under chapter 11 of the U.S. Bankruptcy Code,[6] the Clerk of the Bankruptcy Court sent the Debtors a routine notice, "Requirements for Debtor-In-Possession Chapter 11 Cases" (Bankr. Dkt. 7), reminding them that they were required to close all of their existing bank accounts and open a new debtor-in-possession account. In a separate notice, they were also reminded that they were required to file monthly operating reports ("MORs") reflecting their financial condition. (Bankr. Dkt. 8).

8.      At the time of the filing of the Petition, the Debtors' revenue from the Hazlehurst Lumber Co., Inc. and other related businesses had diminished considerably as a result of a downturn in the housing market, and the Debtors had only two (2) sources of income:  Social Security benefits of $3,382.00 per month (Bankr. Dkt. 108) and funds from a testamentary spendthrift trust[7] (the "Trust") (Jt. Ex. 1 at 9) established by Mrs. Adams' father before his death.

---

[5] On October 7, 2013, the later-appointed chapter 11 trustee commenced an adversary proceeding against the Debtors' son for turnover of Hickory Hills Lodge and the surrounding land.  *See Stephen Smith, Trustee v. Shannon Adams*, Adv. Proc. 13-00082-NPO.  The Trustee and the Debtors' son reached a settlement, and an Order Granting Motion to Approve Compromise and Settlement with Shannon Adams (Bankr. Dkt. 335) was entered on January 27, 2014.

[6] Hereinafter, the "Code" refers to the United States Bankruptcy Code found at title 11 of the United States Code, and all code sections refer to the Code unless otherwise noted.

[7] A spendthrift trust is a trust that restrains the voluntary or involuntary transfer of a beneficiary's interest in the trust.  *See* RESTATEMENT (SECOND) OF TRUSTS § 152(2); *see In re Blount*, 438 B.R. 98, 106 (Bankr. E.D. Tex. 2010).

Distributions to Mrs. Adams from the Trust are not property of the estate, a finding that was undisputed at Trial but only after some research and investigation into the matter by Smith.[8]

9.    The Debtors closed their personal checking account and opened a new checking account as debtors in possession (the "DIP Account") (Jt. Ex. 8) on August 8, 2012.

10.    In connection with their Petition, the Debtors filed the statement of financial affairs (the "SOFA") (Bankr. Dkt. 39) and bankruptcy schedules (the "Schedules") (Bankr. Dkt. 40), both of which were signed by the Debtors under penalty of perjury as to their accuracy. Mrs. Adams testified at Trial that the SOFA and the Schedules were true and correct.  Mr. Adams was not present at the Trial because of an illness, but the parties stipulated that his testimony would be the same as Mrs. Adams' testimony.

11.    In the SOFA, the Debtors disclosed the transfers of their investment properties in March 2011 to Adams & Adams. (Bankr. Dkt. 39 at 13).

12.    In their Summary of Schedules (Bankr. Dkt. 40 at 1), the Debtors reported assets totaling $4,589,000.00 and liabilities of $11,430,252.07.  Most of their assets ($3,107,000.00) consisted of personal property, and most of their liabilities ($5,348,407.00) consisted of the Debtors' personal guarantees of the debts of Hazlehurst Lumber Co., Inc.

13.    In Schedule B-Personal Property ("Schedule B") (Bankr. Dkt. 40 at 4-5), the Debtors listed the following personal property:

---

[8] *See* 11 U.S.C. § 541(c) (excluding from the definition of property of the estate any property that contains "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law"); *see also* MISS. CODE ANN. § 91-9-713 (describing spendthrift provision as restriction within meaning of § 541(c)).

| Type of Property | Description and Location of Property | Current Value of Debtor's Interest in Property, without Deducting any Secured Claim or Exemption |
| --- | --- | --- |
| * * * | | |
| 4.  Household goods and furnishings, including audio, video, and computer equipment. | **Furniture, Appliances, Electronics, and Accessories** | 7,500.00 |
| 5.  Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | **Included in 4. Above** | 0.00 |
| * * * | | |
| 7.  Furs and jewelry. | **Wedding Rings** | 10,000.00 |
| 8.  Firearms and sports, photographic, and other hobby equipment. | **Various** | 5,000.00 |
| * * * | | |
| 13.  Stock and interests in incorporated and unincorporated businesses.  Itemize. | * * *  **95% Interest in Hickory Hills Hunting Preserve, Inc.**  * * * | 670,000.00 |
| 14.  Interests in partnerships or joint ventures.  Itemize | **Adams & Adams Management, LP** | 2,060,000.00 |

(Jt. Ex. 1 at 7-8).  The total value of the items described in numbers 4, 5, 7, and 8 of Schedule B is $22,500.00.

14.     Item 2 in Schedule B required the Debtors to disclose "[c]hecking, saving or other financial accounts." (Jt. Ex. 1 at 7).  In response, the Debtors listed information about their personal checking account (which they closed when they filed their Petition), but they did not list any information about the Adams & Adams Account.

15.     The Debtors identified Mrs. Adams' beneficiary interest in the Trust in response to item 20 in Schedule B, which required them to list "[c]ontingent and noncontingent interests in . . . trust." (Jt. Ex. 1 at 9).

16.     As of this Opinion, the Debtors have not amended the SOFA, Schedule B, or any of their other Schedules.

17.     Chris B. Savell ("Savell"), a certified public accountant, assisted the Debtors in completing the SOFA and the Schedules.  Savell was familiar with the Debtors' financial affairs before the commencement of their Bankruptcy Case.  He was previously employed by the Debtors in 2001 to perform accounting services for the Hazlehurst Lumber Co., Inc. and in 2007, to assist Mrs. Adams in her efforts to restructure the debts of the Debtors' lumber mill.  Savell also helped the Debtors prepare their individual income tax returns in 2010 and the 2011 income tax returns of Adams & Adams.

18.     Savell testified at Trial about the Debtors' response to item 14 in Schedule B, which required them to describe their "[i]nterests in partnerships or joint ventures." (Jt. Ex. 1 at 8).  The Debtors disclosed that they had a beneficial interest in Adams & Adams valued at $2,060,000.00 in response to item 14.  According to Savell, he arrived at $2,060,000.00 by calculating the sum of the appraised values of all of the real estate holdings of Adams & Adams, including Twelve Oaks and the 647 acres of land in Copiah County, Mississippi.  He further explained that the appraised value of Twelve Oaks included the contents of the historic home although he could not recall on cross examination if the actual appraisal on which he based his valuation of Twelve Oaks specifically included any personal property. He understood that when the Debtors acquired Twelve Oaks, the purchase price included its contents and for that reason he did not include any personal property in Schedule B apart from the Debtors' interest in Adams & Adams.  In the 2011 income tax returns prepared by Savell on behalf of Adams & Adams, however, he reported that Adams & Adams did not own any personal property, and, accordingly, he did not prepare a depreciation schedule for any personal property.  (F.B. Ex. 2).  He reported in "Schedule L Balance Sheets per Books" only that Adams & Adams owned land valued at $1,200,000.00, the cost basis for all of its real estate holdings (*Id.*).

19.     Savell also testified at Trial about the Debtors' response to item 13 in Schedule B, which required them to describe their "[s]tock and interests in incorporated and unincorporated businesses." (Jt. Ex. 1 at 8).  The Debtors disclosed that they held a 95% interest in Hickory Hills, which they valued at $670,000.00.  As with the valuation of Twelve Oaks, Savell testified that $670,000.00 included not only the structure but also the contents of Hickory Hills Lodge.  When asked on cross examination whether he believed Hickory Hills owned any personal property such as jewelry, however, he testified he was unsure.

20.     Mrs. Adams testified that she handled all transactions in the DIP Account and Adams & Adams Account.  From August 16, 2012 until November 14, 2012, she made only one (1) deposit into the DIP Account of $550.00 on October 31, 2012.  (Jt. Ex. 8).  In comparison, she made deposits into the Adams & Adams Account during the month of October 2012 totaling $46,764.00.  According to Mrs. Adams, these deposits probably consisted of Trust funds and Social Security benefits.

21.     Although there were no deposits made into the DIP Account until November 14, 2012, Mrs. Adams withdrew funds from the DIP Account beginning October 5, 2012.  (Jt. Ex. 8).  That same month, the DIP Account became overdrawn and incurred numerous "returned check" fees.  (*Id*. at 9-11).

22.     Mrs. Adams continued writing checks from the Adams & Adams Account after the Petition was filed even though the Debtors did not list the Adams & Adams Account in the SOFA or their Schedules.  Mrs. Adams testified the Adams & Adams Account was maintained only to pay the expenses incurred by the investment properties owned by Adams & Adams, but it is apparent that Mrs. Adams made substantial payments for the benefit of her adult children from the Adams & Adams Account.  For example, Mrs. Adams testified that a check (#3079) dated

September 11, 2012 to 1st Financial Bank in the amount of $432.00 was for payment of her daughter's credit card bill. This payment is similar to others made to 1st Financial Bank that the Debtors disclosed in the SOFA as gifts to their daughter for car and house payments, insurance, and credit cards.[9] (SOFA Attach. 2). Mrs. Adams testified that she did not know why she wrote another check (#3094) also dated September 11, 2012 to American Express in the amount of $284.80, and she could not point to any expense of the investment properties as a possible reason. She testified that a debit of $3,000.00 on October 29, 2012 paid the credit card debt of either Mr. Adams or the Debtors' daughter. A debit on November 27, 2012 made payable to Toys R Us was for the benefit of her children or grandchildren. Many withdrawals from the Adams & Adams Account were in even amounts of cash, and Mrs. Adams was unable to recall the use for these funds.

23.    First Bank conducted an examination of the Debtors under Rule 2004 of the Federal Rules of Bankruptcy Procedure [10] (the "2004 Examination") (Bankr. Dkt. 60) on October 25, 2012.

24.    On January 22, 2013, Mrs. Adams transferred $6,000.00 into the Adams & Adams Account from the DIP Account. The Debtors did not seek permission from the Court to transfer funds from the DIP Account to the Adams & Adams Account. Mrs. Adams testified that she did not remember why she transferred these funds.

---

[9] Later, Smith, as the chapter 7 trustee, commenced a separate adversary proceeding on September 24, 2014 against the Debtors' daughter seeking to recover the gifts as fraudulent transfers under § 548. *See Stephen Smith, Chapter 7 Trustee for the Bankruptcy Estate of Gerald Adams and Kay Adams v. Linden Carole Adams Barefield*, Adv. Proc. 14-00070-NPO. The Trustee and the Debtors' daughter reached a settlement, and an Order Granting Motion to Approve Compromise and Settlement (Bankr. Dkt. 472) was entered on February 26, 2015.

[10] Rule 2004 of the Federal Rules of Bankruptcy Procedure authorizes a court to order an examination of the debtor or any other person about "the acts, conduct, or property or . . . liabilities and financial condition of the debtor." FED. R. BANKR. P. 2004.

25.     First Bank learned about the $6,000.00 withdrawal from the DIP Account on February 25, 2013 when the Debtors filed the MOR for the month of January 2013 (Jt. Ex. 9) and the attached cash disbursement journal showed "Adams & Adams, LP" as the payee.  The Adams & Adams Account was not designated as the DIP Account and was not disclosed until April 18, 2013 when the Debtors filed the MOR for the month of March 2013.  (Bankr. Dkt. 208).

26.     On February 27, 2013, First Bank filed the First Bank's Motion to Convert and Alternative Motion for Appointment of Trustee (the "Motion to Appoint Chapter 11 Trustee") (Bankr. Dkt. 164).  The main ground asserted by First Bank for the appointment of a chapter 11 trustee was the January 2013 withdrawal of $6,000.00 from the DIP Account into the Adams & Adams Account.  Other grounds asserted by First Bank included the Debtors' inability to fund a plan of reorganization, the Debtors' continued payments for the benefit of their adult children, and the unexplained disbursements of cash.

27.     Savell testified at the hearing on the Motion to Appoint Chapter 11 Trustee held on April 9, 2013.  His testimony then, similar to his testimony at Trial, was that the $6,000.00 withdrawal likely consisted of Trust funds not reachable by creditors, and Mrs. Adams' interest in the Trust was disclosed in Schedule B.

28.     The Order Regarding Appointment of Chapter 11 Trustee (Bankr. Dkt. 202) was entered on April 15, 2013, and as previously mentioned, Smith was appointed the chapter 11 trustee (Bankr. Dkt. 228) on May 23, 2013.

29.     On August 14, 2013, approximately one (1) year after they filed their Schedules and the SOFA, the Debtors appeared before Smith at the second § 341 meeting of creditors[11] (the "Chapter 11 Trustee's Meeting").  (F.B. Ex. 1).  There, the Debtors testified under oath that to the best of their knowledge, all of the information in the Schedules was accurate and complete. (F.B. Ex. 1 at 4).  Smith testified at Trial that it was at the Chapter 11 Trustee's Meeting that he learned from the Debtors that they owned furniture, artwork, jewelry, and firearms of significant value located at Twelve Oaks and Hickory Hills Lodge, and not from the SOFA, Schedule B, MORs, or information gleaned at the first § 341 meeting of creditors conducted in the chapter 11 case before Smith's appointment (the "DIP's Meeting").

30.     Upon the Trustee's Motion to Convert to Chapter 7 (the "Motion to Convert") (Bankr. Dkt. 278), the Court converted the Debtors' chapter 11 case to chapter 7 (Bankr. Dkt. 295) pursuant to § 1112(b) on October 21, 2013. The Debtors did not oppose the Motion to Convert.  The reasons given by Smith for the conversion were that:  (1) the estate had no source of income; (2) any recovery for the benefit of the estate would be from the liquidation of assets; (3) and the liquidation of assets of the estate would take place more efficiently in a chapter 7 proceeding.  At that time, Smith's status changed from chapter 11 trustee to chapter 7 trustee. On December 6, 2013, the Debtors appeared and testified at the chapter 7 meeting of creditors (the "Chapter 7 Trustee's Meeting").  (Bankr. Dkt. 320).

31.     Smith retained Benny Taylor of Taylor Auction & Reality, Inc. to sell the Debtors' non-exempt personal property.  Both of the Trustee's Motions to Approve Auction and for Authority to Sell Assets Free and Clear of Liens, Interest, Encumbrances and Claims

---

[11] Section 341(a) requires the U.S. Trustee (the "UST") to call a meeting of creditors, and § 343 requires the debtor "to appear and submit to examination" at that meeting.  11 U.S.C. §§ 341(a), 343.

("Motions to Approve Auction") (Jt. Exs. 2 & 5) were unopposed by the Debtors. Paragraph 3 of the Motion to Approve Auction filed on May 19, 2014 provided that "[a]t the time of the filing of the bankruptcy petition, *the Debtor was the owner of certain personal property* including, but not limited to firearms, jewelry, paintings, sculptures and miscellaneous items which were not exempt by the Debtor." (Jt. Ex. 2) (emphasis added). Similarly, paragraph 3 of the Motion to Approve Auction filed on June 19, 2014 provided that "[a]t the time of the filing of the bankruptcy petition, *the Debtor was the owner of certain personal property* located at Twelve Oaks." (Jt. Ex. 5) (emphasis added). Orders Granting Trustee's Motion to Approve Auction and for Authority to Sell Assets Free and Clear of Liens, Interest, Encumbrances and Claims (Jt. Exs. 3 & 6) were entered on June 12, 2014 and July 23, 2014.

32. On August 18, 2014, Smith filed an Auctioneer's Report of Sale (Jt. Ex. 4) disclosing the liquidation of fifty-seven (57) items described as "art, jewelry and firearms" in the amount of $28,849.00. *See* Fed. R. Bankr. P. 6004. These items consisted of the contents of the Debtors' residence at Hickory Hill Lodge. Included in these items were forty-five (45) pieces of jewelry; two (2) bronze sculptures by Bruce Brady; seven (7) paintings and prints, including oil paintings by Will Hinds and Emmitt Thames; a revolver; and two (2) rifles.

33. Smith also filed a second Auctioneer's Report of Sale (Jt. Ex. 7) on August 18, 2014 disclosing the liquidation of another 278 items of furniture and artwork generating an additional $49,816.00. These items consisted of the contents of Twelve Oaks. Included in these items were paintings, mirrors, a half-tester bed, and other antiques and furniture.

34. Smith testified that the Debtors and their counsel were very cooperative during the auctions. The furniture at Twelve Oaks was sold on site, and Mrs. Adams assisted Smith in sorting the antiques from the less valuable reproductions.

35.     In summary, 335 items of personal property from Twelve Oaks and Hickory Hills Lodge ultimately were sold by Smith for $78,665.00 as a result of the Debtors' disclosures at the Chapter 11 Trustee's Meeting.  The items sold did not include items that the Debtors told Smith were owned by their adult children or items that the Debtors designated that they wished to retain within their allowable exemption of $20,000.00.  *See* MISS. CODE ANN. § 85-3-1.

36.     First Bank filed the Adversary Complaint objecting to the Debtors' discharge under § 727(a)(2)(B) and § 727(a)(4)(A).

37.     Pursuant to the Pretrial Order, First Bank filed its proposed findings of fact and conclusions of law, which it captioned Memorandum Opinion Granting Complaint to Deny Discharge Pursuant to 11 U.S.C. §§ 727(a)(2)(B) and 727(a)(4)(A) (Adv. Dkt. 30), and the Plaintiff's Trial Brief (Adv. Dkt. 31) on February 18, 2015.

38.     Also pursuant to the Pretrial Order, the Debtors filed the Defendants' Proposed Findings of Fact and Conclusions of Law (Adv. Dkt. 33) and the Defendants' Trial Brief (the "Defendants' Trial Brief") (Adv. Dkt. 34) on February 25, 2015.

## Discussion

First Bank asks the Court to deny the Debtors a discharge of their debts under § 727(a)(2)(B) on the ground that the Debtors intended to hinder, delay, or defraud First Bank by concealing estate property (furniture, artwork, jewelry, and firearms) and transferring funds from the DIP Account to the Adams & Adams Account.  In the alternative, First Bank asks the Court to deny the Debtors a discharge of their debts under § 727(a)(4)(A) on the ground the Debtors knowingly and fraudulently made a false oath in the Schedules and the SOFA.

In general, "[t]he purpose of Chapter Seven of the Bankruptcy Code is to give individual debtors a 'fresh start,' and the heart of this goal is embodied in § 727's discharge provisions."

*Ichinose v. Homer Nat'l Bank (In re Ichinose)*, 946 F.2d 1169, 1172 (5th Cir. 1991) (citations omitted). The grounds for denial of a discharge enumerated in § 727(a) are designed to prohibit the granting of a discharge to debtors who seek shelter under the Code but "play fast and loose with their assets or with the reality of their affairs." *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987). Only one of the grounds for non-dischargeability under § 727(a) must be proven. *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 250 (4th Cir. 1994) (citing another source).

Courts generally consider the conduct of spouses separately because when one spouse engages in improper conduct and the other does not, the innocent spouse is entitled to a discharge. *See First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir. 1983) (denying discharge to husband who fraudulently transferred estate property but granting discharge to wife who did not participate in fraudulent activities). Here, however, Mr. Adams did not appear at Trial and his counsel stipulated that his testimony would be consistent with his wife's. Thus, for each claim under § 727(a), the Court considers whether the conduct of the Debtors together warrants the denial of their discharge.

First Bank's contention that the Debtors omitted estate property from Schedule B is the basis for both its concealment/transfer and false oath grounds for the denial of the Debtors' discharge under § 727(a). The Court turns first to the concealment/transfer claim under § 727(a)(2)(B).

## A.      Section 727(a)(2)(B):  Concealment/Transfer of Estate Property

Section 727(a)(2)(B) provides:

(a)      The court shall grant the debtor a discharge, unless—

(2)      the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has

transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(B)   property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(B).  In order to prevail on its discharge claim arising out of the Debtors' alleged post-petition transfer or concealment of bankruptcy estate property, First Bank must prove, by a preponderance of the evidence, that there was (1) a transfer, removal or concealment of property (2) belonging to the bankruptcy estate (3) post-petition (4) that was made with the intent to hinder, delay, or defraud a creditor of the Debtors.  *See Hughes v. Wells (In re Wells)*, 426 B.R. 579, 588 (Bankr. N.D. Tex. 2006) (citation omitted).  If First Bank establishes a *prima facie* case under § 727(a)(2)(B), then the burden shifts to the Debtors to explain their actions. *See Farouki*, 14 F.3d at 249 (footnote omitted) (citation omitted).  The ultimate burden of persuasion, however, rests with First Bank.  *See id*.

In examining the evidence at Trial, the Court is mindful that § 727(a)(2)(B) requires proof of actual fraud; a showing of constructive fraud is insufficient.  *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989).  Because a debtor ordinarily will not admit to hindering, delaying, or defrauding creditors intentionally, fraudulent intent may be established by circumstantial evidence or inferred from a debtor's course of conduct.  *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701-02 (5th Cir. 2003).  Courts have identified several factors that tend to demonstrate fraudulent intent.  *Chastant*, 873 F.2d at 91.  Among these factors is the retention and concealment of estate property.  *See Reed*, 700 F.2d at 991-92 (rapid conversion of non-exempt assets to satisfy and reduce home mortgages and diversion of receipts into undisclosed account confirmed a fraudulent motivation).  In addressing First Bank's § 727(a)(2)(B) claim, the Court looks at the totality of the conduct of the Debtors but for clarity

considers the allegations regarding the furniture, artwork, jewelry and firearms separately from those related to the Adams & Adams Account.

    1.    **Furniture, Artwork, Jewelry & Firearms**

The Debtors did not describe in Schedule B the personal property they kept at Twelve Oaks and Hickory Hills Lodge. The Debtors nevertheless contend that Schedule B adequately disclosed all of the personal property they owned indirectly through Adams & Adams and Hickory Hills through the identification of their beneficial interests in Adams & Adams and Hickory Hills. The Debtors contend in the alternative that their testimony at the Chapter 11 Trustee's Meeting, particularly Mrs. Adams' testimony, clarified any ambiguity or misunderstanding regarding the existence and ownership of the personal property. Finally, the Debtors point to the cooperation Smith received from them, Savell, and Noble in liquidating the assets in question as evidence that they did not act with fraudulent intent.

The Debtor's accountant, Savell, provided some explanation at Trial why the furnishings and artwork were not disclosed in Schedule B apart from the reference to the Debtors' interests in Adams & Adams and Hickory Hills. The Court finds his explanation questionable given that neither Adams & Adams nor Hickory Hills owned any personal property, a point made clear by his testimony at Trial. *See supra* ¶¶ 18-19. His explanation becomes even more concerning with respect to the jewelry. Although it is not entirely unreasonable for the purchase price of an historical home to include its contents when the artwork and furniture are of the same period, this reasoning does not apply to the undisclosed items of jewelry that were not shown to have any connection to Twelve Oaks or Hickory Hills Lodge.

Recognizing the problem in establishing a connection between the jewelry and Twelve Oaks or Hickory Hills Lodge, the Debtors point to the description "Wedding Rings" in Schedule

B.   But even counsel for the Debtors admitted at Trial that "Wedding Rings" does not adequately describe the jewelry owned by Mrs. Adams.   As later discovered by Smith, "Wedding Rings" included not just two (2) rings but a total of seven (7) rings, plus ten (10) necklaces, (8) earrings, six (6) pendants, five (5) brooches, a diamond pendant watch, and assorted gold chains.   The variety and number of the pieces of jewelry suggest that their concealment was not an honest mistake, and Mrs. Adams' reference to certain pieces as gifts from her mother suggest a motive for their concealment.

The privilege of discharge is granted only to those debtors who make a good faith effort in producing a full picture of their financial affairs.   *The Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 763 (Bankr. N.D. Tex. 2005).   "Concealment is not confined to physical secretion. It covers other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge owed information."   6 COLLIER ON BANKRUPTCY ¶ 727.02[6][b] (16th ed. 2015).   Given the totality of the evidence, the Court finds that the Debtors did in fact conceal the furniture, artwork, jewelry, and firearms.

In reaching this finding, the Court holds that the subsequent cooperation of the Debtors at the Chapter 11 Trustee's Meeting did not expunge their earlier concealment of the personal property.   Although the Court agrees that a debtor's voluntary revelation of undisclosed information at a § 341 meeting of creditors may weigh against a finding of intent to defraud, that scenario did not occur here.   *Cf. In re Mims*, No. 10-52281-KMS, 2011 WL 1749809, at *4 & n.9 (Bankr. S.D. Miss. May 6, 2011) (confirming chapter 13 plan over the objection of the trustee after finding that any inaccuracy in the debtor's bankruptcy schedules was caused by her attorney's inadvertent failure to make needed corrections rather than the debtor's intent to conceal assets or information from the trustee).   The Debtors did not voluntarily disclose the

furniture, artwork, jewelry, and firearms but first mentioned them only in response to specific questioning by Smith on August 14, 2013 at the Chapter 11 Trustee's Meeting, which was the second § 341 meeting held in the Bankruptcy Case.  These items should have been identified in Schedule B apart from the Debtors' beneficial interests in Adams & Adams and Hickory Hills, or at least during the DIP's Meeting held on October 22, 2012 or the 2004 Examination conducted by First Bank on October 25, 2012.  The significance of their cooperation with Smith in the liquidation of their assets with respect to the issue of fraudulent is overstated by the Debtors, given that their cooperation did not occur until *after* Smith's discovery.  It is not unusual for debtors to cooperate after they are caught.  Moreover, it behooved the Debtors to get the best price for the furniture, artwork, jewelry, and firearms once it became clear that the personal property would be sold for the benefit of their creditors.  In preparing for the auction, there was no reason for them *not* to cooperate with Smith.

First Bank's allegations in support of its § 727(a)(2)(B) claim do not end with the concealment of the furniture, artwork, jewelry, and firearms.  It also challenges the Debtors' conduct with respect to the Adams & Adams Account, a matter to which the Court now turns.

### 2.    Adams & Adams Account

It is undisputed that Mrs. Adams failed to deposit funds into the DIP Account and instead allowed them to continue being deposited in the Adams & Adams Account.  She also transferred funds from the DIP Account to the Adams & Adams Account.  Finally, the Debtors failed to disclose the Adams & Adams Account until April 18, 2013 when they filed the March 2013 MOR.

The Debtors' stated reason why the Social Security benefits were deposited into the Adams & Adams Account rather than into the DIP Account was the federal government's delay

in processing the Debtors' request to change the destination of the electronic deposits. This reason does not explain why the Debtors did not withdraw the Social Security benefits from the Adams & Adams Account and deposit them into the DIP Account until their change request could be processed. According to Savell, who helped prepare the MORs, he was unaware of the activity in the Adams & Adams Account until First Bank brought it to his attention through Debtors' counsel. He testified that he told Mrs. Adams to transfer the Social Security benefits and could not explain why Mrs. Adams apparently ignored his instructions.

The Debtors attempt to make light of First Bank's allegations in the Adversary Complaint regarding the Adams & Adams Account by insisting that they are merely repeating those made in First Bank's Motion to Appoint Chapter 11 Trustee. Indeed, the factual basis for First Bank's argument in support of the appointment of a chapter 11 trustee was the $6,000.00 transfer of funds from the DIP Account to the Adams & Adams Account, which is the same for its § 727(a)(2)(B) argument here.[12] Although the Debtors agree that the Court's appointment of Smith was proper under the circumstances, they insist that any further action would be unnecessarily punitive because the source of the $6,000.00 withdrawal from the DIP Account was the Trust and because Smith himself has not expressed any dissatisfaction with the transactions in the Adams & Adams Account. According to the Debtors, because their creditors could not reach income from the Trust, there was no conversion of estate property and, therefore, no fraudulent intent. Moreover, the Debtors contend that the deposits into the Adams & Adams Account only demonstrate their desire to pay their creditors.

The Court rejects the Debtors' assertion that the nature of the funds transferred to the Adams & Adams Account pretermit a finding of fraudulent intent. Although it was undisputed

---

[12] At Trial, Watt clarified that the Debtors' argument does not rest on *res judicata* principles or the doctrine of election of remedies.

at Trial that the income Mrs. Adams received from the Trust is not property of the estate, Mrs. Adams co-mingled trust funds with other deposits in the DIP Account, and the Debtors made no effort to trace the $6,000.00 to the Trust. The timing and amount of the $6,000.00 withdrawal does not correspond to any specific deposit from the Trust, and, moreover, Mrs. Adams testified she could not recall the reason for the transfer to the Adams & Adams Account. In other words, she could not recall a specific intent to withdraw Trust funds from the DIP Account. Indeed, the withdrawal appears to be a random amount of cash unconnected to any specific expense. If Mrs. Adams intended merely to pay certain creditors outside the Debtors' proposed plan of reorganization (as suggested by the Debtors' counsel at Trial as a possible motive for her actions) she could have drawn checks made payable to these creditors on the DIP Account rather than the Adams & Adams Account. In doing so, there would have been some transparency to these transactions. The $6,000.00 withdrawal from the DIP Account and corresponding deposit into the Adams & Adams Account makes the activity in the Adams & Adams Account more troubling given the amount of money paid to or for the benefit of the Debtors' adult children, a pattern of conduct that preceded the filing of the Petition.

Mrs. Adams' memory failed her not only as to the reason for the $6,000.00 withdrawal but also for many other withdrawals of cash, in even numbers, from the Adams & Adams Account and DIP Account. Her general explanation was that some of her creditors returned checks or refused to accept checks written on the DIP Account and she had no choice but to pay them in cash. She attributed their refusal to accept the checks to the title of the DIP Account ("Gerald J. or Kay H. Adams, Debtor in Possession, Case 12-02569 Operating Account") that appeared on the top portion. The Court finds, however, that if certain creditors were uncomfortable with the name of the DIP Account, the Debtors could have sought relief from the

Court regarding the checking account. Instead, Mrs. Adams chose to pay them in cash without permission from the Court.

The activity in question took place in the Adams & Adams Account although it was not designated as the DIP Account and was not disclosed in the MROs until April 18, 2013, which is eight (8) months into the Bankruptcy Case. With the filing of the Petition under chapter 11 of the Code, the Debtors became debtors-in-possession of the estate and took on the rights, powers, and fiduciary duties of a trustee. 11 U.S.C. §§ 1106-08; *see C.F.T.C. v. Weintraub*, 471 U.S. 343, 355 (1985) (citation omitted). Among the duties of a trustee specified in § 704(a)(8) is the filing of periodic operating reports. 11 U.S.C. § 704(a)(8). The UST is charged with supervising the administration of chapter 11 cases and has adopted reporting requirements embodied in its guidelines. 28 U.S.C. § 586(a). The UST guidelines require a debtor-in-possession to file a MOR by the 15th day following the end of the month covered by the report. Because MORs are the means by which creditors can monitor the operations of a debtor-in-possession, they are "the life blood of the Chapter 11 process" and are "more than busy work." *In re Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991). Although the Debtors filed MORs, they were inaccurate because they provided less than a full picture of their financial condition by failing to disclose the Adams & Adams Account.

To counter the Debtors' contention that "First Bank seeks to construe ill-motive, i.e., fraud, where none exists" (Adv. Dkt. 34 at 4) regarding the mistakes the Debtors made with respect to the Adams & Adams Account, First Bank relies on *Wilson v. Hudnall (In re Hudnall)*, No. 05-82837, 2007 WL 1259144, at *1 (Bankr. W.D. La. Apr. 27, 2007). There, the debtor revealed at the § 341 meeting of creditors that she had deposited $51,000.00 into her daughter's bank account to pay for equipment to be used by a new company that had been formed by the

debtor and her daughter just before the bankruptcy case was commenced.  The funds belonged either to the bankruptcy estate of the debtor or that of a related entity.  The debtor deposited the funds into her daughter's account after she was unable to negotiate a bank loan secured by a certificate of deposit on those same funds.  At a second § 341 meeting conducted after conversion of the case to chapter 7, the debtor revealed the $51,000.00 deposit and other assets of the bankruptcy estate omitted from the bankruptcy schedules.  The bankruptcy court rejected the debtor's "ignorance of the law" defense.  *Id.* at *5.  The bankruptcy court noted that the debtor had the benefit of legal counsel at the time of the transfer and had received notice from the Court early in the case informing her of the prohibition against transfers of estate property. *Id.* at *2.

The Court does not find *Hudnall* squarely analogous to the instant matter but agrees with First Bank that it provides guidance as to how to view the Debtors' contentions that they acted to the best of their abilities.  Mrs. Adams did not directly deposit sales proceeds into a relative's account to assist that relative in buying equipment for a newly formed business, but she did allow deposits to be made into the Adams & Adams Account that should have been made into the DIP Account, failed to take corrective action, and then compounded the error by withdrawing funds from the Adams & Adams Account for the benefit of her adult children.  To the extent she attempted to assert at Trial an "ignorance of law" defense, her efforts are unavailing in light of Savell's testimony that he told her to withdraw the Social Security deposits from the Adams & Adams Account. Additionally, like the debtor in *Hudnall*, Mrs. Adams had the benefit of continuous legal representation in her Bankruptcy Case[13] and also received the routine notice from the Bankruptcy Clerk, "Requirements for Debtor-In-Possession Chapter 11 Cases."

---

[13] *See supra* note 2.

First Bank also relies on *U.S. Trustee v. Sieber (In re Sieber),* 489 B.R. 531 (Bankr. D. Md. 2013). The debtor in *Sieber* admitted that he did not deposit all payments received from various transactions into his debtor-in-possession account or disclose those payments in his MORs. He explained that his failure to do so was his belief that he was required to report and deposit only his personal income and did not believe the payments in question constituted personal income. In furtherance of his defense, the debtor insisted that he acted "to the best of his knowledge and belief." *Id.* at 548. Noting that the debtor received a copy of the chapter 11 guidelines from the UST that set forth the duties and obligations of a debtor-in-possession, including the obligation to report all income received, the bankruptcy court in *Sieber* rejected the debtor's explanation for his conduct. The Court agrees with First Bank that this Court likewise should reject the Debtors' explanation as unsatisfactory.

### 3.    Analysis

"Section 727(a)(2)(B) is intended to deny discharge to a debtor who fails to disclose transactions regarding his assets subsequent to filing his petition for bankruptcy." *Adams v. Bostic (In re Bostic),* 400 B.R. 348, 356 (Bankr. D. Conn. 2009) (quoting another source). In some cases, the "[e]vidence that demonstrates confusion or a believable lack of understanding on the part of the Debtors may militate against an inference of fraudulent intent." *Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 784 (Bankr. E.D. Va. 2012) (citation omitted). Here, however, the Court does not find any such lack of understanding. The intent determination under § 727(a)(2)(B) depends in large part on a bankruptcy court's assessment of a debtor's credibility, and the Court did not find Mrs. Adams to be a credible witness. For many years, the Debtors owned and operated the Hazlehurst Lumber Co., Inc. and by any measure are competent, experienced business people. The Court does not believe that they overlooked or were confused

about whether it was necessary in Schedule B to list 335 pieces of furniture, artwork, jewelry, and firearms or report in the MORs the Adams & Adams Account, which was very active after the commencement of their Bankruptcy Case.  The Debtors compare the amount yielded from the sale of the contents of Hickory Hills Lodge ($28,849.00) with the total value of the items disclosed in numbers 4, 5, 7 and 8 of Schedule B ($22,500.00) to show that the difference was only about $6,000.00.  But this comparison is inaccurate because it does not include the contents of Twelve Oaks that yielded an additional $49,816.00 in gross sales.  A proper comparison between the sales proceeds of the undisclosed items located at Hickory Hills Lodge and Twelve Oaks ($78,665.00) and the purported value of the items of personal property described in Schedule B ($22,500.00) weighs in favor of a finding of fraudulent intent, as does the nature of the more valuable items, such as the oil paintings and sculptures by significant Mississippi artists.  Moreover, with respect to the Adams & Adams Account, the Court notes that "[f]ew, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the details of the debtor's finances." *Johnson v. Baldridge (In re Baldridge)*, 256 B.R. 284, 290 (Bankr. E.D. Ark. 2000).  The Court thus concludes that the Debtors acted with fraudulent intent and should be denied a discharge under § 727(a)(2)(B).

Having found proof of conduct justifying a denial of the Debtors' discharge under § 727(a)(2)(B), it is unnecessary for the Court to rule on First Bank's § 727(a)(4)(A) claim.  *See Reed*, 700 F.2d at 989 (either § 727(a)(2) or § 727(a)(5) would suffice for denial of discharge).  However, because the same conduct underlies the false oath claim, the Court addresses briefly First Bank's contentions under § 727(a)(4)(A).

**B.**      **Section 727(a)(4)(A):  False Oath**

Section 727(a)(4)(A) provides:

(a)      The Court shall grant the debtor a discharge unless—

    (4)      the debtor knowingly and fraudulent, in or in connection with the case—

        (A)      made a false oath or account.

11 U.S.C. § 727(a)(4)(A).   The purpose of § 727(a)(4)(A) "is to ensure that dependable information is supplied to those interested in the administration of the bankruptcy estate so that they can rely upon it without the need for the trustee or other interested parties to dig out [the] true facts in examination or investigations." *Camacho v. Martin (In re Martin)*, 88 B.R. 319, 323 (D. Colo. 1988) (citation omitted).   To prevail under § 727(a)(4)(A), First Bank had the burden of showing that:  (1) the Debtors made a statement under oath; (2) the statement was false; (3) the Debtors knew the statement was false; (4) the Debtors made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.   *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).   Bankruptcy schedules are executed under oath and penalty of perjury, and a false statement or omission in the schedules may warrant a denial of discharge.   *Id.* at 178; *see also Cadle Co. v. Pratt (In re Pratt)*, 411 F.2d 561, 566 (5th Cir. 2005) (citation omitted) ("An omission of an asset can constitute a false oath.").

In *U.S. Trustee v. Gainey (In re Gainey),* No. 11-00039-NPO, 2012 WL 528218 (Bankr. S.D. Miss. Feb. 17, 2012), this Court examined what it must consider in determining whether a discharge should be denied under § 727(a)(4)(A).   "[T]he Fifth Circuit [has] held that there [is] sufficient evidence of the debtors' reckless indifference to the truth based on 'the existence of more than one falsehood, together with [the debtor]'s failure to take advantage of the opportunity

to clear up all inconsistencies and omissions when he filed his amended [s]chedules.'" *Gainey*, 2012 WL 528218, at *4 (citing *Beaubouef*, 966 F.2d at 178); *Fox v. Ridgway (In re Ridgway)*, No. 10-00088-DWH, 2011 WL 5509156, *15 (Bankr. S.D. Miss. Nov. 10, 2011). Thus, a debtor who takes steps to amend his schedules to correct them before or during a § 341 meeting of creditors is not generally thought to possess the requisite fraudulent intent to deny discharge. *Zitwer v. Kelly (In re Kelly)*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992). *But see Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001) (amendment did not correct falsity). Here, the Debtors never attempted to amend Schedule B notwithstanding the omission of the furniture, artwork, jewelry, and firearms.

First Bank's allegations in support of its discharge claim under § 727(a)(4) essentially duplicate its allegations under § 727(a)(2)(B). First Bank alleges that the Debtors made false statements in Schedule B because of the omission of the furniture, artwork, jewelry, and firearms. The Court has already found the Debtors did in fact conceal the personal property.

Section 727(a)(4) does not penalize a debtor for honest mistakes. Indeed, courts acknowledge that "petitions, schedules, and statements are often filed hastily, memories fail, and innocent mistakes and omission can occur." *Ivey v. Anderson (In re Anderson)*, No. 04-2070, 2006 WL 995856, at *7 (Bankr. M.D.N.C. Feb. 13, 2006) (citation omitted). So long as there is no underlying intent to deceive, honest mistakes do not fall under § 727(a)(4). For the reasons previously stated with respect to First Bank's arguments under § 727(a)(2)(A), however, the Court finds that First Bank has met its burden of proving that the omission of the furniture, artwork, jewelry, and firearms from Schedule B was not caused by an honest mistake but by an intent to deceive or, at the very least, a reckless indifference to the truth. These facts are not analogous to those in *Menotte v. Moore (In re Moore)*, 375 B.R. 697 (Bankr. S.D. Fla. 2007), a

case cited by the Debtors in the Defendants' Trial Brief.  In *Moore*, the bankruptcy court found the debtor's testimony to be credible that she found herself in a desperate situation and used estate assets without an intent to defraud her creditors.  *Id*. at 701-02.  All of the transactions at issue in *Moore* were for the debtor's own living expenses, not the expenses of a relative funded primarily by the Trust of an undisclosed amount.  In sum, the Court finds that First Bank has established by a preponderance of the evidence that the Debtors knowingly and fraudulently made a false oath in connection with Schedule B and, accordingly, the Debtors should be denied a discharge under § 727(a)(4).

**Conclusion**

Based on the foregoing, the Court concludes that First Bank has demonstrated by a preponderance of the evidence that the Debtors intended to hinder, delay, or defraud First Bank by concealing estate property (furniture, artwork, jewelry, and firearms) and transferring funds from the DIP Account to the Adams & Adams Account and should be denied their discharge pursuant to § 727(a)(2)(B).  The Court further finds that the Debtors knowingly and fraudulently, in or in connection with their Bankruptcy Case, made a false oath and should be denied their discharge pursuant to § 727(a)(4)(A).  Accordingly, the Court finds that the Adversary Complaint is well taken.  A separate order consistent with this opinion will be entered in accordance with Federal Rules of Bankruptcy Procedure 7054 and 9021.

##END OF OPINION##